**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**SEP 8 1999**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

In re: BRYAN K. FOSTER,

     Debtor,

------------------------------------------

BRYAN K. FOSTER; REINHART, BOERNER, VAN DEUREN, NORRIS & RIESELBACH, P.C.,

     Appellants,

v.

JEFFREY L. HILL, Trustee,

     Appellee.

No. 98–1147

---

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 97–Z–1781)**

---

Stephen C. Peters, (John C. Smiley, Rosemary L. Flint, with him on the briefs), Lindquist, Vennum & Christensen, Denver, Colorado, for Appellants.

Mark A. Redmiles, Senn, Lewis, Visciano & Strahle, Denver, Colorado, for Appellee.

---

Before **BALDOCK**, **KELLY**, and **MURPHY**, Circuit Judges.

**MURPHY**, Circuit Judge.

Bryan Foster, who was convicted of wire fraud and forced into involuntary bankruptcy, jointly brings this appeal with Reinhart, Boerner, Van Deuren, Norris & Rieselbach, S.C. (Reinhart), his former attorneys. They challenge an order compelling Reinhart to give the trustee of Foster's bankruptcy estate all documents related to Foster's pre-bankruptcy civil lawsuits.[1] Foster and Reinhart (collectively Foster) argue that the documents are protected by the attorney-client privilege and the work-product doctrine, and that the order compelling their disclosure violated the Fifth Amendment.[2] Foster further argues the bankruptcy court should have reviewed the documents *in camera* before concluding that the trustee could control his attorney-client privilege, and that the Fifth Amendment and the work-product doctrine did not apply.

To the extent the order determined the work-product doctrine did not apply, this court affirms. The bankruptcy court, however, should have reviewed the documents *in camera* to determine, as to each, whether the Fifth Amendment barred its compelled disclosure, and whether the policy favoring a trustee's access to information about assets of an estate outweighed the policies underlying the

---

[1]The bankruptcy court entered the order; the district court affirmed it; and this court has jurisdiction under 18 U.S.C. § 1291 and 28 U.S.C. § 158(d) of Foster's appeal from that decision.

[2]Foster conceded his Sixth Amendment claim at oral argument.

attorney-client privilege. No general rule allows the trustee for an individual placed in involuntary bankruptcy to invariably control the individual's attorney-client privilege as to the debtor's pre-petition civil claims. We thus **REVERSE** the district court's order and **REMAND** the case to allow the bankruptcy court to inquire further into Foster's attorney-client-privilege and Fifth Amendment claims.

I.    FACTS AND PROCEEDINGS

Until 1996 Foster worked in Colorado as a financial manager, partly by connecting investors with companies needing short-term loans. In 1995 he persuaded three Montana investors, whom he had met through attorney William Baldassin, to give him $100,000 each as part of a planned loan to a New York company. Foster never sent the $300,000 to New York, and apparently forged papers showing that he had. When Baldassin and the investors discovered his deception, they pressed him to return the money, and then reported him to a United States Attorney. He retained Reinhart. A federal grand jury in Montana indicted Foster on five counts of wire fraud.

While preparing Foster's defense, Reinhart developed three civil suits in his name to collect debts from various entities, including those with whom he had invested the $300,000. Reinhart filed those suits, and a civil claim against Baldassin based on his conduct in trying to recover the $300,000. It intended the suits to aid Foster's defense, by substantiating his claims that he had intended to

pay the investors back, and by casting doubts on Baldassin's motives. The defense failed, and Foster was convicted and sentenced to 41 months' imprisonment. He appealed his conviction.

Not yet satisfied, the Montana investors petitioned to subject Foster to involuntary relief under chapter 7 of the Bankruptcy Code. *See* 11 U.S.C. § 303. Foster consented to the entry of an order for relief. The court appointed a trustee for the bankruptcy estate, and the trustee asked Reinhart to continue handling the civil claims. Reinhart replied affirmatively, noting its knowledge of the cases and that, as a creditor of the estate, it did not "represent or hold any interest adverse to the Debtor or to the estate with respect to the matters," but shared the estate's interest in "obtaining the proceeds from these lawsuits to satisfy Foster's creditors." The trustee agreed to the representation. The Montana investors, however, objected, and Reinhart withdrew.

The trustee then asked Reinhart to give him its files for the civil suits. Reinhart turned over some 4,000 pages, most of which Foster had apparently given it. They included correspondence, pleadings, and such "source documents" as promissory notes, bank statements, and wire-transfer records. The trustee objected to Reinhart's retention of some documents as work-product, but disavowed any current demand for Reinhart's correspondence with Foster, for which Foster claimed attorney-client privilege.

The trustee then moved the bankruptcy court to order Reinhart to turn over the work-product it had withheld. The trustee invoked 11 U.S.C. § 542(e), which empowers a court to order anyone holding recorded information about property of a bankruptcy estate to turn over the information to the estate's trustee. His motion reserved the right to assert control of Foster's attorney-client privilege, but said he did not then need to do so.

Reinhart submitted a log of thirty-six withheld documents, apparently claiming work-product protection and attorney-client privilege as to most, and invoking the Fifth Amendment.[3] None of the thirty-six was from Foster's criminal-defense files. The court heard arguments from the trustee, Reinhart, and Foster's bankruptcy counsel. The trustee urged that Reinhart submit for *in camera* review both the criminal files and the thirty-six logged documents, so the court could decide if they were in fact attorney-client privileged or shielded by the Fifth Amendment. He also argued the log was inadequate, amounting to a blanket claim of attorney-client and Fifth Amendment privileges. Urging *in camera* review, he disclaimed any desire "to obtain . . . documents that are subject to the attorney/client privilege." In addition, the Reinhart attorney, who had defended Foster in his criminal trial, suggested *ex parte* discussion of Foster's

---

[3]Neither party included the log of withheld documents in its appendix on appeal.

-5-

claims, at least as to the Fifth Amendment. The court, however, expressed discomfort with that idea. It said it might later review the documents, but did not.

Instead, it rejected Foster's arguments in a written order. *See In re Foster*, 217 B.R. 631 (Bankr. D. Colo. 1997). Apparently finding the log of withheld documents sufficient, it focused on the question of who should control Foster's attorney-client privilege. *See id.* at 635. It held that "the right to assert, or to waive, the attorney-client privilege, passes from a debtor to a bankruptcy trustee where . . . it involves recovery of assets of the estate in the nature of pre-petition civil actions." *Id.* at 638. It then denied the work-product claim on the ground that the trustee was not adverse to Foster in relation to the civil suits. *See id.* at 641–42. Finally, the bankruptcy court held the Fifth Amendment inapplicable because Reinhart's production of documents could not implicate Foster's right against personal self-incrimination, and because a bankrupt who turns over incriminating documents is not testifying, but surrendering property that is no longer his. *See id.* at 643–44.

The bankruptcy court stayed its order pending appeal to the district court. That court affirmed, but ordered the trustee not to disclose the disputed documents "to any third party without prior approval of the bankruptcy court for good cause shown." Foster did not seek a stay pending this appeal, and Reinhart turned over the documents.

At oral argument, the parties agreed that Foster's civil claims have all been definitively resolved, and that the Ninth Circuit has affirmed his conviction. After oral argument, the Department of Labor filed a new criminal complaint against Foster.[4] It alleges that, from late 1994 to early 1996, he violated the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001–1461, by misrepresenting and concealing facts which ERISA required him to disclose about his investment of pension funds.

II.    DISCUSSION

"In reviewing a district court's decision affirming the decision of a bankruptcy court, this court applies the same standards of review which governed the district court." *Broitman v. Kirkland (In re Kirkland)*, 86 F.3d 172, 174 (10th Cir. 1996). We thus review the bankruptcy court's legal conclusions *de novo*, without deferring to the district court. *See id.*; *Grey v. Federated Group, Inc. (In re Federated Group, Inc.)*, 107 F.3d 730, 732 (9th Cir. 1997). The parties do not challenge any factual findings.

---

[4]Foster has filed two motions to supplement the record on appeal. The first of these motions, a motion to supplement the record with the criminal complaint filed against Bryan Foster by the Department of Labor, is granted. The now-supplemented record contains this complaint. On August 26, 1999 a grand jury returned an indictment against Bryan Foster charging him with those crimes alleged in the criminal complaint. *See* Fed. R. Crim. P. 6-7. Foster's second motion, a Motion for Leave to File Second Supplemental Appendix, seeks to supplement the record with this indictment. Because the information contained in the indictment can also be found in the criminal complaint which is now part of the record, Foster's motion to file a second supplemental appendix is denied.

A.      Attorney-Client Privilege

A party claiming the attorney-client privilege must prove its applicability, which is narrowly construed. *See Intervenor v. United States (In re Grand Jury Subpoenas)*, 144 F.3d 653, 658 (10th Cir. 1998). The party must bear the burden as to specific questions or documents, not by making a blanket claim. *See FDIC v. United Pac. Ins. Co.*, 152 F.3d 1266, 1276 n.6 (10th Cir. 1998). In this case, however, the court essentially declined to review or investigate the specifics of Foster's privilege claims after he asserted them and proffered a log of withheld documents.[5]

1.      *Bankruptcy-Specific Rules Relevant to Attorney-Client Privilege*

Federal common law governs control of a debtor's privilege. *See, e.g., Moore v. Eason (In re Bazemore)*, 216 B.R. 1020, 1022–23 (Bankr. S.D. Ga. 1998) (citing Fed. R. Bankr. P. 2004 & 9017; Fed. R. Evid. 501). The Bankruptcy Code creates "a two-part scheme for turnover of property of the estate or other information related to the debtor's property or financial affairs." *Keller v. Blinder*

---

[5]The trustee argues, as an alternative basis to affirm, that Foster did not adequately specify why the documents withheld were privileged. The trustee, however, has forfeited this point. While he argued it to the bankruptcy court, that court evidently found the log sufficient. *See In re Foster*, 217 B.R. 631, 635 (Bankr. D. Colo. 1997). Nothing suggests the trustee raised the log's insufficiency in district court as an alternative basis to affirm; that court did not address the issue. Nor has he included the log in his appendix on appeal. By holding he has forfeited the issue on this appeal, this court does not foreclose him from arguing or the bankruptcy court from finding on remand that specific claims of privilege in the log are too vague. We simply cannot resolve the argument at this juncture.

*(In re Blinder, Robinson & Co.)*, 140 B.R. 790, 792 (D. Colo. 1992) (citing 11

U.S.C. §§ 542(a), (e)).  Section 542(a) requires anyone holding property of the

estate to deliver it to the trustee.  *See id.* (citing 11 U.S.C. § 542(a), historical and

statutory notes).[6]  Section 542(e), meanwhile, authorizes a court, "[s]ubject to any

applicable privilege, . . . [to] order an attorney, accountant, or other person that

holds recorded information . . . relating to the debtor's property or financial

affairs, to turn over or disclose such recorded information to the trustee."  11

U.S.C. § 542(e).  Congress's purpose in adding § 542(e) to the Code was "to

restrict . . . the ability of accountants and attorneys to withhold information from

the trustee," and thus to eliminate their leverage, under State-law lien provisions,

to command payment before other creditors by withholding information needed to

administer the estate.  *Commodity Futures Trading Comm'n v. Weintraub*, 471

U.S. 343, 351 (1985) (citing S. Rep. No. 95–989, at 84 (1978), *reprinted in* 1978

U.S.C.C.A.N. 5787, 5870; and H.R. Rep. No. 95–595, at 369–70 (1977), *reprinted

in* 1978 U.S.C.C.A.N. 5963, 6325–26).

In *Weintraub,* the Supreme Court held that a corporation's trustee in

bankruptcy controls its attorney-client privilege.  *See id.* at 358.  Noting that

corporations must act through agents, the Court analyzed the issue functionally:

---

[6]The Bankruptcy Code defines "property of the estate" to include "all legal
or equitable interests of the debtor in property as of the commencement of the
case."  11 U.S.C. § 541(a)(1).  The debtor must "surrender to the trustee all
property of the estate and any recorded information . . . relating to property of the
estate." 11 U.S.C. § 521(4).

"Because the attorney-client privilege is controlled, outside of bankruptcy, by a corporation's management, the actor whose duties most closely resemble those of management should control the privilege in bankruptcy, unless such a result interferes with policies underlying the bankruptcy laws." *Id.* at 348, 351–52. That actor is the trustee, the Court concluded, and the trustee's control of the privilege serves bankruptcy policy. *See id.* at 352–54. It furthers the goal of "uncovering insider fraud" by helping trustees develop claims against corporate managers, while preventing the managers from "us[ing] the privilege as a shield . . . [to] thwart an investigation into their own conduct." *Id.* at 353–54.

The Court specified that its holding "has no bearing on the problem of individual bankruptcy." *Id.* at 356. It explained that its role-based analysis would not apply to a natural person:

> [A] corporation, as an inanimate entity, must act through agents. . . . An individual, in contrast, can act for himself; . . . no "management" . . . controls a solvent individual's attorney-client privilege. If control over that privilege passes to a trustee, it must be under some theory different from the one that we embrace in this case.

*Id.* at 356–57.

A bankruptcy court recently construed *Weintraub* to require, in individual-debtor cases, that a court decide whether to let the trustee control the privilege by weighing "the interests of a full and frank discussion in the attorney-client relationship and the harm to the debtor upon a disclosure [against] the trustee's duty to maximize the value . . . and represent the interests of the estate."

-10-

*Bazemore*, 216 B.R. at 1024 (citing *Weintraub*); *accord In re Rice*, 224 B.R. 464, 469 (Bankr. D. Or. 1998) (requiring case-by-case balancing). The parties to this appeal essentially agree with *Bazemore* that bankruptcy courts should balance those interests case-by-case. Foster argues the court failed to do so in this case; the trustee claims it succeeded. Because Foster does not advocate a *per se* rule that a trustee may never control an individual debtor's privilege, this court need not consider any such rule. We instead simply assume for purposes of this appeal that in some cases, subject to the above balancing, a trustee may control an individual debtor's privilege.[7]

2.      *The Bankruptcy Court's Analysis*

The trustee never asked the bankruptcy court to order Reinhart to turn over documents covered by the attorney-client privilege; it disavowed any such request, asking only that the court review the documents to ensure that they were indeed privileged. The court, however, did not adopt the trustee's suggested approach. Instead, it issued an opinion which, although saying several times that it was analyzing who should control the privilege on a case-specific basis, ultimately developed a broad new rule that "[t]he right to assert an attorney-client privilege is

---

[7]Parties may not of course bind this court by stipulating to a rule of law. *See, e.g.*, *Koch v. United States*, 47 F.3d 1015, 1018 (10th Cir. 1995). In this case, however, we do not adopt any rule that courts must balance the factors listed in *Bazemore*. We simply decline to address *sua sponte* the antecedent legal question whether a court should ever allow a bankruptcy trustee to control an individual debtor's attorney-client privilege. We lack the benefit of any adversarial briefing of the issue.

acquired by the trustee in bankruptcy . . . where, as here, the trustee has become entitled to and the estate is owner of assets in the nature of a debtor's pre-petition causes of action against third parties." *Foster*, 217 B.R. at 635; *see also id.* at 638.

The court suggested it had undertaken a case-specific analysis, describing its conclusion as "supported by . . . the nature of the claims in this case and the particular documents sought by the Trustee." *Id.* at 638. Its case-specific analysis, though, was limited to noting that the pre-petition suits were the estate's main assets; that they entailed good-faith "affirmative claims for breach of contract, fraud, and claims on promissory notes against third persons with whom the Debtor conducted business pre-petition"; and that the documents sought were "strictly limited to those in [Reinhart]'s files for . . . pending civil actions . . . [and not] from [Foster]'s criminal files." *Id.* at 639. While those observations may have been a good start, the court failed to relate them to the actual documents withheld by reviewing those documents *in camera*. Moreover, while the court acknowledged Foster's argument that documents in the civil files were "closely related" to those in the criminal file, it treated that position as irrelevant to the attorney-client-privilege issue, noting only that its opinion separately addressed the Fifth Amendment claim. *See id.* at 639 n.15. Even if the Fifth Amendment did not shield Foster's exchanges with his attorneys, it does not necessarily follow that any harm from their disclosure is irrelevant to the question of who should control

-12-

his attorney-client privilege. In deciding that question, the court never weighed the potential harm to Foster from disclosure of incriminating confidences. Nor did it review any specific documents or categories thereof, despite the rule that a party claiming attorney-client privilege must do so document-by-document. *See United Pac. Ins.*, 152 F.3d at 1276 n.6.

While the court did not focus on specific documents in balancing the pertinent factors, it did not adopt a *per se* rule that a trustee may control an individual debtor's privilege in every case. Instead, its opinion as a whole seems to create a *per se* rule for a broad subset of all individual-debtor cases. By stating its holding in terms of a few broad features of Foster's case, it created a *per se* rule for all cases sharing those features. It thus essentially held that a trustee always controls an individual's privilege as to any pre-petition, good-faith, affirmative civil claim "against third persons with whom the Debtor conducted business pre-petition." *Id.* at 639; *see also id.* at 635, 638.

In arriving at its new rule for that broad subset of individual-debtor cases, the bankruptcy court first noted the Supreme Court's warning that its analysis in *Weintraub* cannot apply to individual debtors. *See Foster*, 217 B.R. at 636–37. It then aptly summarized the rationales of courts and commentators who have concluded trustees should *not* control individual debtors' attorney-client privileges. *See id.* at 637. To let trustees do so may discourage client confidences; violate individuals' reasonable expectations that, so long as they do

not abuse the privilege, they alone will decide when to waive it; and ignore the distinction that, while a trustee may control a corporate debtor as would its prebankruptcy management, a trustee can no more control an individual debtor than could someone who bought all of the debtor's assets. *See id.* (citing *McClarty v. Gudenau*, 166 B.R. 101, 102 (E.D. Mich. 1994); *In re Hunt*, 153 B.R. 445, 452 (Bankr. N.D. Tex. 1992); and William R. Mitchelson, Jr., Comment, *Waiver of the Attorney-Client Privilege by the Trustee in Bankruptcy*, 51 U. Chi. L. Rev. 1230, 1259 (1984)).

Despite noting those rationales, the court found support for its contrary approach in three sources: in *Weintraub*, in a bankruptcy-court opinion, and in the anomaly of having different rules for different debtors. *See id.* at 637–40.[8] None of those, however, can justify the court's apparently *per se* rule, which governs a large category of cases. The breadth of that rule results from the court's approach to balancing, which focused not on specific documents or facts of the case, but

---

[8]The court also relied on two plainly inapposite cases. *See Foster*, 217 B.R. at 639. In one, the Seventh Circuit held that no privilege protects material given to an attorney to include in a bankruptcy filing, because "information . . . transmitted to an attorney with the intent that the information will be transmitted to a third party . . . is not confidential." *United States v. White*, 950 F.2d 426, 430 (7th Cir. 1991) (quotation omitted). Foster, however, did not give any material to Reinhart to include in a bankruptcy filing. In the other, a pre-*Weintraub* case, the court did say that a trustee "succeeds to a debtor's right to assert or waive the attorney-client privilege," but it was discussing a corporate debtor. *See Turner v. Davis, Gillenwater & Lynch (In re Investment Bankers, Inc.)*, 30 B.R. 883, 886 (Bankr. D. Colo. 1983). Its comment cannot, in light of *Weintraub*, simply be extended to individual debtors.

broad features thereof. If a court resolves a privilege dispute by a balancing analysis, it must instead focus on specific facts and documents.

In developing its broad approach, the bankruptcy court first cited *Weintraub* for an unassailable proposition, i.e., that the Court recognized a Congressional intent in § 542(e) to subject the attorney-client privilege in bankruptcy cases to judicial limitation. *See id.* at 638 & n.12 (citing 471 U.S. at 351 (quoting legislative history)). It next noted that *Weintraub* had "balanced (a) the rights and needs of a trustee to fulfill his or her fiduciary duty with (b) the federal interests that would be impaired by the trustee's control of the [privilege as to] prebankruptcy communications." *Id.* at 638 (citing 471 U.S. at 353). It then inferred "from *Weintraub* and legislative history" that a debtor's "right to invoke the attorney-client privilege in bankruptcy is subject to the particular circumstances of the case." *Id.* at 639.[9] As noted, however, its subsequent analysis of Foster's particular circumstances was in fact very general.

The bankruptcy court's policy discussion built on *Weintraub* to conclude that "important anomalies [will] arise" if individual debtors retain their privilege as to pre-petition communications while corporate debtors do not. *Id.* at 640. The court found it anomalous to strip the privilege from a corporation, as in *Weintraub*, but not from a sole proprietorship. *See id.* "By mere happenstance of business

---

[9]Extending that inference to individual debtors is not inevitable but, as discussed above, this court assumes the propriety of doing so for purposes of this appeal. *See supra* at 10 & n.7.

form," it concluded, "a trustee and the creditors might arbitrarily be denied critical information . . . [and thus] access to, or recovery on, their claims." *Id.* Foster's status as a natural person who is, unlike a corporation, subject to incarceration, is not a "mere happenstance of business form." The *Weintraub* Court and many others have recognized the need to treat individuals and corporations differently in some if not all cases.[10] The anomaly rationale is not tenable; it would dictate a uniform rule passing any debtor's privilege to a trustee.

The court also relied on an opinion allowing a liquidating trustee to control the privilege of an individual chapter 11 debtor. *See Whyte v. Williams (In re Williams)*, 152 B.R. 123, 125–26, 129–30 (Bankr. N.D. Tex. 1992). The trustee in *Williams* was investigating pre-petition transfers to the debtor's family. *See id.* at 126–28. In letting the trustee control the privilege, the court stressed the fiduciary duty to the bankruptcy estate Williams had voluntarily assumed by becoming a debtor-in-possession. *See id.* at 127–28. It also noted that losing control of the privilege "[could] have no adverse effect on [him], although there [was] a potentially adverse effect on [his] family members." *Id.* at 129. It discounted the

---

[10]*See* 471 U.S. at 356–57; *Yaquinto v. Touchstone, Bernays, Johnston, Beall & Smith, L.L.P.*, No. Civ.A. 398–CV–1671P, 1999 WL 345228, at *2 (N.D. Tex. June 1, 1999); *In re Rice*, 224 B.R. 464, 468–71 (Bankr. D. Or. 1998); *Moore v. Eason (In re Bazemore)*, 216 B.R. 1020, 1024 (Bankr. S.D. Ga. 1998); *McClarty v. Gudenau*, 166 B.R. 101, 102 (E.D. Mich. 1994); *In re Hunt*, 153 B.R. 445, 451–53 (Bankr. N.D. Tex. 1992); *In re Silvio de Lendegg Ocean Devs. of Am., Inc.*, 27 B.R. 28, 28 (Bankr. S.D. Fla. 1982); *accord* William R. Mitchelson, Jr., Comment, *Waiver of the Attorney-Client Privilege by the Trustee in Bankruptcy*, 51 U. Chi. L. Rev. 1230, 1258–59 (1984).

latter effect, noting bankruptcy law not only "does not protect a debtor's insiders or affiliates from . . . avoidance litigation," but specifically creates "causes of action to avoid transfers to insiders." *Id.* at 129. *Williams* thus relies on lack of harm to the debtor, a consent rationale based on his voluntary assumption of a fiduciary duty, and an anti-insider-fraud rationale. None of those rationales applies in this case,[11] assuming as we must the truth of Foster's untested claims about the harm of losing control of his privilege.[12]

Accordingly, neither *Williams* nor *Weintraub* justifies the bankruptcy court's broad new rule. As noted above, the parties concur the court should have resolved Foster's claim by balancing the harm to him and to the attorney-client privilege

---

[11]Foster was convicted of wire fraud; the trustee has charged him with concealing and fraudulently transferring assets, and has filed adversary complaints to set aside fraudulent transfers; and the bankruptcy court denied him a discharge in a default judgment entered upon the trustee's motion alleging bankruptcy fraud. Nonetheless, the trustee has never suggested he needed to control Foster's attorney-client privilege as to the pre-petition civil suits in order to investigate or prevent Foster or Reinhart from using the privilege to conceal fraud on the bankruptcy estate, as in *Williams* and the cases discussed *infra* in note 13. He has only argued he needed such control to prosecute the civil suits.

[12]Three opinions besides *Williams* have let trustees control individual debtors' privileges, but none supports the order in this case. In two, the trustee for an individual bankrupted by a tort judgment was investigating claims against the debtor's liability insurer, and against a lawyer provided by that insurer. *See Bazemore*, 216 B.R. at 1022; *In re Smith*, 24 B.R. 3, 4 (Bankr. S.D. Fla. 1982). Those lawyers could thus use the privilege to "thwart an investigation into their own conduct." *Weintraub*, 471 U.S. at 353–54 (quoted in *Bazemore*, 216 B.R. at 1025). No such insider-fraud rationale applies in this case. *See supra* note 12. The third opinion is wholly inapposite. *See In re Fairbanks*, 135 B.R. 717, 722–24 (Bankr. D.N.H. 1991) (stressing "unique facts," as debtor had absconded).

with the trustee's need for information. *See supra* at 10. The court's discussion of *Weintraub* suggested it would analyze Foster's claim in light of "the particular circumstances of the case." *Foster*, 217 B.R. at 639. But it did not in fact examine specific documents or classes of documents. Nor did it balance pertinent factors, like those derived by the *Bazemore* court from *Weintraub*, with regard to the specific facts of Foster's case, instead of broad aspects thereof. *See Bazemore*, 216 B.R. at 1024. This court thus reverses the district court's order and remands the matter for the bankruptcy court to further proceed in a manner consistent with this opinion.

B.     Fifth Amendment

In declining to turn over documents, Reinhart also invoked Foster's Fifth Amendment right to avoid self-incrimination. When the court asked why Foster's conviction did not vitiate that issue, the Reinhart attorney noted his then-pending appeal.[13] He said there were "further . . . answers" to the court's question, but he

---

[13]While the subsequent affirmance of Foster's conviction dispels any risk that disclosures could incriminate him at a retrial of the wire-fraud charges, it does not moot his Fifth Amendment claim. As noted above, the Department of Labor charged Foster several weeks ago with criminally misrepresenting his handling of ERISA funds. While he has not expressly asserted a right to withhold the disputed documents in light of that new complaint, he has supplemented the record to include it, and had previously based his claim in part on the Department's investigation. Foster mainly based that claim on the risk the government may yet prosecute him for other crimes arising out of the transactions for which he was convicted. If he can show a realistic risk of such prosecution, or that the disputed documents may affect the ERISA prosecution, then he can urge the courts to undo the compelled disclosure. *See United States v. Schmidt*, 816 F.2d 1477, 1481 (10th Cir. 1987) (requiring party to show reasonable fear

[did]n't feel comfortable fully addressing them in open court . . . [A]nswering the Court's questions fully could implicate my client's right to remain silent. . . . I would be happy to speak with the Court on an *ex parte* basis. But absent more comfort about protecting the privilege, I don't think I can answer the question fully.

The court rejected his offer. The trustee also suggested the court review the files *in camera* to "[c]leanse out anything that . . . would somehow impair Mr. Foster's criminal defense." The court rejected that approach as well.

1.    *Governing Law*

The Fifth Amendment does not shield from discovery the contents of any documents Foster voluntarily created, even if the contents incriminate him. *See United States v. Doe*, 465 U.S. 605, 610–12 (1984) (citing *Fisher v. United States*, 425 U.S. 391, 409–10 (1976)).[14] That Amendment could only bar the turnover

_____

that answering question may "'furnish a link in the [prosecution's] chain of evidence,'" and that "the risks of incrimination . . . [are] 'substantial and "real," not merely trifling or imaginary'" (quoting *Hoffman v. United States,* 341 U.S. 479, 486 (1951) and *Marchetti v. United States,* 390 U.S. 39, 53 (1968))).

[14]As the Court explained in *United States v. Doe*,
the Fifth Amendment protects the person asserting the privilege only from compelled self-incrimination. Where the preparation of business records is voluntary, no compulsion is present. A subpoena that demands production of documents "does not compel oral testimony; nor would it ordinarily compel the [person subpoenaed] to restate, repeat, or affirm the truth of the contents of the documents sought." . . .

> [T]he Fifth Amendment would not be violated by the
> fact alone that the papers on their face might incriminate
> the [person whose rights are asserted] . . . .

-19-

order if Reinhart's act of producing a document would itself be both incriminating to Foster and testimonial. *See id.* at 612–13; *Fisher*, 425 U.S. at 410–13; *United States v. Clark*, 847 F.2d 1467, 1471–74 (10th Cir. 1988) (applying *Fisher* and *Doe*). As the Supreme Court explained in *Fisher*, that necessitates an inquiry focused on proof of the document's existence, possession, and authenticity:

> The act of producing evidence in response to a subpoena . . . has communicative aspects of its own, wholly aside from the contents of the papers produced. Compliance with the subpoena tacitly concedes the existence of the papers demanded and their possession or control by [their owner or the owner's agent]. It also would indicate the [owner or agent]'s belief that the papers are those described in the subpoena. . . . [C]ompulsion [is] clearly present, but the more difficult issues are whether the tacit averments [made by the act of production] are both "testimonial" and "incriminating". . . . These questions perhaps do not lend themselves to categorical answers; their resolution may instead depend on the facts and circumstances of particular cases or classes thereof.

425 U.S. at 410. The *Doe* Court declined to review a district court's finding that the act of producing certain documents would be incriminating and testimonial, stressing that the finding "essentially rest[ed] on [the] determination of factual issues" and had been affirmed by the court of appeals. 465 U.S. at 613–14.

Like *Doe*, this court's review of an act-of-production claim in *Clark* shows how fact-intensive the analysis is. *See* 847 F.2d at 1471–74; *see also Dorokee Co. v. United States (In re Grand Jury Subpoena)*, 697 F.2d 277, 279 (10th Cir. 1983)

---

465 U.S. 605, 611 (1986) (citing *Fisher v. United States*, 425 U.S. 391, 396 (1976), and quoting *id.* at 409).

("Whether the act of producing documents in response to a subpoena is both testimonial and incriminating is a difficult issue whose resolution depends 'on the facts and circumstances of particular cases or classes thereof.'" (quoting *Fisher*, 425 U.S. at 411)). We cannot review such a claim without a record or fact-specific analysis. By rejecting the suggested *in camera* review, the bankruptcy court has prevented this court from determining if any of Reinhart's acts of production could incriminate Foster by affirming a document's existence, authenticity, or possession. Nor can we review whether any such link that the act of production might forge in the government's chain of proof is already a "'foregone conclusion.'" *Clark*, 847 F.2d at 1472 (quoting *Fisher*, 425 U.S. at 411).

2. *Foster's Burden of Proof under the Act-of-Production Rule*

The trustee does not defend the bankruptcy court's Fifth Amendment analysis. He instead argues Foster has not borne his burden of showing how any act of producing a document, and not its contents, is testimonial or incriminating. Foster replies that the court had to review the documents *in camera* to resolve act-of-production issues. He claims that, by submitting a log and asking to discuss the issue *ex parte*, he bore his initial burden of "provid[ing] enough information to enable the Court to conduct a factual inquiry to determine the incriminating potential of the documents sought and the act of production." *In re Schick,* 215 B.R. 4, 9 (Bankr. S.D.N.Y. 1997). *Schick* held that a debtor withholding documents under the Fifth Amendment need not "compromise the privilege he

seeks to protect" by disclosing their contents, but may instead "submit[] a written explanation, *in camera* if requested, identifying the documents . . . and as to each . . ., explaining in general or circumstantial terms why production is incriminating." *Id.* (footnote omitted).

After rejecting Reinhart's offer to discuss the Fifth Amendment claim *ex parte*, the court never came close enough to addressing the merits of that claim to trigger Foster's duty to show how the act of producing each document would be testimonial and incriminating. As the hearing ended, the court said it might later review the documents, but its next step was to issue its order.

That order held the act-of-production rule did not apply at all. *See Foster,* 217 B.R. at 643. After summarizing the rule, it reasoned that "when documents are sought from someone other than the debtor, courts have held that the act of production cannot possibly implicate the debtor's right against personal self-incrimination." *Id.* (citing *In re Duque,* 177 B.R. 397, 404 (Bankr. S.D. Fla. 1994) and *Danning v. Donovan (In re Carter)*, 62 B.R. 1007 (Bankr. C.D. Cal. 1986)). *Duque* and *Carter*, however, do not apply to this case.[15]

---

[15]The court also relied on the unique "dynamics of a bankruptcy." *Foster*, 217 B.R. at 643. It quoted one opinion noting the inequity of allowing a debtor who intentionally "throws himself before the mercy of the Bankruptcy Court and his creditors" to avoid fully disclosing his finances, and another reasoning that compelled disclosure of documents entails not "testimony" but "surrender" of property to which the trustee is already entitled. *See In re Save More Foods, Inc.,* 96 B.R. 1, 4 (D.D.C. 1989); *Fairbanks,* 135 B.R. at 725 (quotation omitted). Those opinions are inapposite. Foster never sought the bankruptcy court's mercy; his bankruptcy was involuntary. The trustee, meanwhile, has never argued that

-22-

The courts in each case did, technically, reject Fifth Amendment claims made by debtors' pre-bankruptcy attorneys. In *Duque*, the subpoena compelled the attorneys to produce documents concerning fees paid them on behalf of the debtor, who had fled the country after being convicted of fraud, and whose assets the trustee was trying to locate. *See* 177 B.R. at 400–01. The court held that the subpoenas did not implicate Duque's rights, as they sought not "privileged information as to [his] communications with his counsel . . . [but] non-privileged financial information." *Id.* at 401; *see also id.* at 404 ("[B]ecause the subpoenas seek non-privileged information. . . from Duque's attorneys, and not from Duque, they cannot possibly implicate [his] right against personal self-incrimination."). In this case, of course, Foster and Reinhart insist that the disputed documents *are* attorney-client privileged.

In *Carter*, attorneys for a bankrupt facing prosecution refused to answer questions or produce documents concerning their representation of him. *See* 62 B.R. at 1010. The court applied *Fisher*'s rule that compelled disclosures by an agent of one facing incrimination do not *in themselves* implicate the Fifth Amendment: "'[t]he taxpayer's privilege under [the Fifth] amendment is not violated . . . because enforcement against a taxpayer's lawyer would not 'compel' the taxpayer to do anything — and certainly would not compel him to be a 'witness' against himself.'" *Id.* (quoting *Fisher*, 425 U.S. at 397). But the court

the documents are property of the estate subject to surrender under § 542(a).

then applied the second half of *Fisher*'s analysis, in which the Court held that "the Fifth Amendment was inapplicable, [but] . . . information in the hands of third parties might be protected by other sources, including the attorney-client privilege." *Id.* at 1011 (citing 425 U.S. at 400).

To be precise, then, the turnover order aimed at Reinhart directly implicated the attorney-client privilege, not the Fifth Amendment. Under *Fisher*, however, that privilege effectively incorporates a client's Fifth Amendment right; it prevents the court from forcing Reinhart to produce documents given it by Foster in seeking legal advice if the Amendment would bar the court from forcing Foster himself to produce those documents. *See* 425 U.S. at 404–05. The bankruptcy court did not note *Duque* and *Carter*'s technical distinction between the Fifth Amendment and the attorney-client privilege. It thus erred as a matter of law in concluding on the basis of those opinions that the act-of-production rule did not apply. The trustee, meanwhile, apparently did not argue the act-of-production rule to the district court as an alternative basis to affirm. He conceded at oral argument on this appeal that the court could not properly undertake to balance the trustee's need for information against Foster's attorney-client privilege to the extent Reinhart properly invoked that privilege to protect its client's Fifth Amendment rights, i.e., to avoid acts of production which the Fifth Amendment would not allow the court to compel Foster himself to perform.

3.    *Conclusion*

Unlike in *Fisher*, the "circumstances of this case" are not "before us." 425 U.S. at 413. Lacking a record, we cannot tell if any of Reinhart's acts of production might entail testimony as to a document's existence, possession, or authenticity. The court must allow him on remand to demonstrate, as to each document surrendered by Reinhart, that the document was attorney-client privileged, and that for Foster to produce it himself would have been testimonial and incriminating under *Fisher*, *Doe*, and *Clark*.

C.    Work Product

Foster also invoked the work-product doctrine, which is broader than and distinct from the attorney-client privilege. *See United States v. Nobles*, 422 U.S. 225, 238 n.11 (1975). The trustee argued it was automatically entitled to Reinhart's work product as a "successor client" to Foster, but the bankruptcy court did not rely on any such *per se* rule.[16] It noted instead that, while the trustee "may not qualify as a 'successor client,' . . . he most certainly is not an opponent or adversary. Rather, [he] and [Foster] share a common interest in pursuing the pending civil litigation." 217 B.R. at 641. The court thus held that the work-product doctrine "is not implicated." *Id.* at 641–42.

On appeal, Reinhart does not claim a right to protect the work-product on its own behalf. Reinhart and Foster instead concede the rule will prevent disclosure

[16]Accordingly, this court expresses no opinion on such a rule.

only if the trustee is adverse to Foster. Accordingly, this court need only decide whether the bankruptcy court properly determined that the trustee was not adverse to Foster in any way relevant to the work-product doctrine. In resolving that question, we heed the admonition that the work-product doctrine is an "intensely practical one, grounded in the realities of litigation in our adversary system." *Nobles*, 422 U.S. at 238.

Foster suggests only one basis on which the trustee should be considered adverse: his duty to "report to the appropriate United States attorney" any "reasonable grounds for believing that any violation [of the bankruptcy laws] . . . has been committed." 18 U.S.C. § 3057. Foster bolsters this point by noting the trustee's contacts with law-enforcement agencies investigating him. But he does not explain how such adversity, unrelated to the civil suits, is relevant to the interest served by the work-product rule, i.e., society's interest in protecting the adversary system by shielding litigants' work-product from their opponents, and thus freeing lawyers to create such materials without fear of discovery and exploitation. *See Hickman v. Taylor*, 329 U.S. 495, 510–11 (1947); *see also Moody v. IRS*, 654 F.2d 795, 800 (D.C. Cir. 1981) (noting doctrine protects not lawyers or clients but "the adversary trial process itself"); *Doe v. United States* (*In re Doe*), 662 F.2d 1073, 1079 (4th Cir. 1981). When a trustee's interest in a suit does not conflict with a debtor's, there is little reason to worry that sharing work-

product will inhibit other attorneys, out of concern for their clients' future interests, from developing such materials.

Foster relies only on the coincidence that withholding work-product in this case happens to address his concern about incrimination. That concern, however, is more directly and properly addressed by the other protections Foster has invoked, i.e., the attorney-client privilege and the Fifth Amendment. It does not entitle an attorney to withhold from a client's trustee in bankruptcy work-product prepared for the client's pre-petition lawsuits, so long as the trustee and the client are not adverse in those suits.

III.    CONCLUSION

This court AFFIRMS the district court's order insofar as it rejected the work-product claim, but REVERSES insofar as it rejected the Fifth Amendment and attorney-client-privilege claims. We REMAND the case to allow the bankruptcy court to review the disputed documents *in camera*. That court must determine whether any of the documents are attorney-client privileged. If so, it must further determine (a) whether the Fifth Amendment barred it from compelling Reinhart's act of producing the document, and (b) whether the trustee's need for the information in this case outweighed any harm to Foster and to the interests served by the attorney-client privilege.